

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

DONALD LEE HINTON,

    Plaintiff,

v.                                                 Civil Action No. **3:18CV59**

MARK AMONETTE, *et al.*,

    Defendants.

## MEMORANDUM OPINION

Donald Lee Hinton, Virginia inmate proceeding *pro se* and *in forma pauperis*, filed this civil action under 42 U.S.C. § 1983.[1] The action proceeds on Hinton's Second Particularized Complaint ("Complaint," ECF No. 19).[2] In his Complaint, Hinton contends that Defendant Harold W. Clarke, Director of the Virginia Department of Corrections ("VDOC"), violated his rights under the Eighth Amendment[3] by promulgating a policy that denies inmates, such as Hinton, medication for Hepatitis C "solely because of cost" and which "'states you must be real sick with

---

[1] That statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

[2] The Court employs the pagination assigned by the CM/ECF docketing system to the parties' submissions. The Court corrects the spelling and capitalization in the quotations from the parties' submissions.

[3] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

this deadly virus' before medication can be given . . . ." (*Id.* at 3.) Hinton contends that Defendant Mark Amonette, Chief Medical Director of the VDOC, violated his Eighth Amendment rights by enforcing this policy. (*Id.* at 4.) Hinton demands monetary damages and injunctive relief. (*Id.* at 7.)

This matter is before the Court on the Motion for Summary Judgment filed by Defendants. (ECF No. 38.) Hinton has responded. (ECF Nos. 42, 43.) For the reasons stated below, the Motion for Summary Judgment (ECF No. 38) will be GRANTED IN PART and DENIED IN PART WITHOUT PREJUDICE.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility of informing the Court of the basis for the motion and identifying the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c), (e) (1986)).

In reviewing a summary judgment motion, the Court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835

(4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). A mere "*scintilla* of evidence," however, will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448). Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").

In support of their Motion for Summary Judgment, Defendants submit: (1) the affidavit of Wandra Reed, R.N. ("Reed Aff.," ECF No. 39–1, at 1–7); (2) the affidavit of Mark Amonette, M.D. ("Amonette Aff.," ECF No. 39–2, at 1–7); (3) copies of Hinton's medical records (ECF No. 39–1, at 8–185); (4) copies of the VDOC's guidelines regarding Hepatitis C Treatment (ECF No. 39–2, at 8–43); and, (5) a copy of Hinton's referral for Hepatitis C treatment (ECF No. 39–2, at 44–46).

At this stage, the Court is tasked with assessing whether Hinton "has proffered sufficient proof, in the form of *admissible* evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added). As a general rule, a non-movant must respond to a motion for summary judgment with affidavits or other verified evidence. *Celotex Corp.*, 477 U.S. at 324. Hinton filed a Response (ECF No. 42) and a sworn document entitled "Affidavit" (ECF No. 43).

The facts offered by affidavit must be in the form of admissible evidence. *See* Fed. R. Civ. P. 56(c). In this regard, the statement in the affidavit or sworn statement "must be made on personal knowledge . . . and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Summary judgment affidavits must also "set out facts that would be admissible in evidence." *Id.* Thus, "summary judgment affidavits cannot be conclusory or based upon hearsay." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (citing *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1252 (4th Cir. 1991); *Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 975 (4th Cir. 1990)).

In his Affidavit, Hinton makes a number of statements that are of no value in assessing the propriety of summary judgment. Specifically, a number of Hinton's statements are either conclusory, immaterial, or simply disagree with arguments made by Defendants. (*See* ECF No. 43.) Hinton's conclusory and inadmissible assertions will not be considered in evaluating the Motion for Summary Judgment. Additionally, Hinton swore under penalty of perjury to the truth of his statements in his Complaint. Portions of Hinton's Complain, however, are conclusory legal assertions, which fail to constitute admissible evidence.

In light of the foregoing submissions and principles, the following facts are established for purposes of the Motion for Summary Judgment. The Court draws all permissible inferences in favor of Hinton.

## II.    UNDISPUTED FACTS

At all times relevant to this suit, Hinton was incarcerated at Lawrenceville Correctional Center ("LVCC"). (Reed Aff. ¶ 5.)

## A. VDOC Policies Regarding Hepatitis C

"Hepatitis C is a viral infection that can lead to liver inflammation and scarring." (Amonette Aff. ¶ 5.) Some individuals infected with Hepatitis C are asymptomatic, and "in those individuals, the disease can persist for many years without causing any harm." (*Id.*) For other individuals, however, "the infection will cause liver disease to progress and result in illness." (*Id.*)

Initially, "VDOC issued Hepatitis C treatment guidelines in February 2004." (*Id.* ¶ 6.) The 2004 guidelines were written before Dr. Amonette "assumed [his] current role within VDOC," and Dr. Amonette "was not involved in the preparation or implementation of those guidelines." (*Id.*) In February 2015, "[b]ased on advancements in the medications used to treat Hepatitis C infections and generally evolving standards of care, VDOC issued updated Hepatitis C guidelines." (*Id.* ¶ 7.) The VDOC guidelines "were revised in collaboration with Richard Sterling, M.D., a hepatologist at [Virginia Commonwealth University ("VCU")]," who is "a nationally-recognized expert in Hepatitis C." (*Id.*) This revision resulted in the June 2015 guidelines. (*Id.*)[4] "Director Clarke, although he has general awareness of the fact that the VDOC Hepatitis C guidelines exist, was not involved in the preparation or administration of these guidelines." (*Id.* ¶ 8.) Additionally, Director Clarke does not "have a hands-on role in the treatment of offenders with Hepatitis C, make decisions about who receives medical care, or have any direct or indirect input into whether a VDOC offender is referred to a specialist or otherwise treated with Hepatitis C medications." (*Id.*)

"Under the updated 2015 guidelines, VDOC entered into a Memorandum of Understanding [("MOU")] with the hepatology group at VCU Medical Center." (*Id.* ¶ 9.) The 2015 guidelines provide that,

> based on the results of certain liver enzyme testing, inmates who show the worst disease progression, including possible impairment of their liver functioning, will

---

[4] The Court omits the secondary citations set forth in Defendants' affidavits.

be referred for assessment by the liver specialists at VCU. Inmates whose laboratory test results show early or mild disease will be monitored through periodic chronic care assessments, and they will also receive routine laboratory testing to monitor their liver enzyme levels and watch for signs that their disease is beginning to progress. The numerical values that determine when an inmate should be considered for referral or additional testing were determined by the liver specialists at VCU.

(*Id.*) Specifically, pursuant to the 2015 guidelines, inmates receive an "Aspartate Aminotransferase to Platelet ratio" ("APRI") score and a "Fibrosis–4 index" ("FIB–4") score. (*Id.* ¶ 10.) The criteria for treatment is as follows:

- APRI score less than 0.5 and FIB–4 score less than 1.45: Offender is monitored but not referred to VCU for evaluation. Inmates in this category will receive periodic laboratory blood testing and chronic care appointments with a medical provider at the institution.
- APRI score of 0.5 to 1.5 and FIB–4 score is between 1.45 and 3.25: Indeterminate range; requires additional testing to determine whether the offender should be referred for evaluation.
- APRI score greater than 1.5 and FIB–4 score greater than 3.25: Offender is automatically referred to VCU for evaluation without any additional testing.

(*Id.*)

With respect to the referral process, "if an institutional physician believed that an inmate should be considered for referral to the Hepatitis C clinic, the physician would forward their medical information, including the results of the recent laboratory testing, to [Dr. Amnonette]." (*Id.* ¶ 11.) Using the above-listed criteria, "Dr. Amonette would determine whether the numerical values in their laboratory results . . . indicated that [the inmate] should be referred for evaluation." (*Id.*) Upon approval for a referral, "the inmate would be seen through the Hepatitis C Telemedicine Clinic. If no medical reason was found to not treat the inmate, the inmate would be prescribed treatment and a prescription would be sent to the VCU pharmacy. That pharmacy would provide the medication for the offender's treatment." (*Id.*) After providers at VCU "determine what treatment is appropriate for a particular inmate, VDOC does not question or otherwise attempt to

6

alter that treatment plan. The decision as to which medication is prescribed is made by the VCU provider at the VCU clinic." (*Id.* ¶ 12.)

VDOC implemented this referral process, in which inmates are referred "to the VCU Hepatitis C Telemedicine Clinic for assessment and treatment by liver specialists[,] because managing the treatment of Hepatitis C and the medications associated with that treatment (typically direct-acting antivirals, or "DAAs") requires specialized training." (*Id.* ¶ 15.) In Dr. Amonette's "professional opinion, it is not clinically appropriate to have VDOC medical providers 'in the field' prescribe direct-acting antivirals without specialty input." (*Id.*) Dr. Amonette indicates that "it is common for primary care physicians to refer patients infected with Hepatitis C to hepatologists for treatment because non-specialist physicians are not completely knowledgeable about the applicable standards of care relating to management of those patients." (*Id.* ¶ 16.)

The MOU between the VDOC and VCU was modified in September 2018, "and the telemedicine clinic has been expanded to allow more inmates to be referred for evaluation and treatment. Following the expansion of the clinic capacity at VCU, that institution has estimated that they will be able to treat approximately 624 offenders per year." (*Id.* ¶ 19.)

In April 2019, the current VDOC guidelines were issued. (*Id.* ¶ 22.) "Under these guidelines, VDOC continues to prioritize treatment based on disease severity, dividing inmates into three priority levels." (*Id.*) Inmates in priority levels 1 and 2, "which include inmates who are determined to have liver scarring or fibrosis, as well as those inmates with medical conditions that could exacerbate liver disease (such as HIV)" receive treatment for Hepatitis C. (*Id.*) "Priority level 3 inmates receive ongoing chronic care monitoring and routine testing to watch for signs of disease progression." (*Id.*)

With respect to the medical treatment provided to individuals with Hepatitis C, "[t]he American Association for the Study of Liver Disease (AASLD) recommends that, at some point, everyone with Hepatitis C should receive treatment. The AASLD, however, also acknowledges that, in certain circumstances, it is appropriate to prioritize care." (*Id.* ¶ 23.) In determining medical treatment for inmates, "VDOC does not have a line-item budget for Hepatitis C medications, and VDOC does not stop referring or treating inmates because a certain figure has been reached." (*Id.* ¶ 13.) Further, "[c]ost is not a factor in determining how many inmates will be treated for Hepatitis C in a fiscal year. VDOC does not make decisions not to treat offenders based on finances." (*Id.* ¶ 14.) VDOC, however, is unable to refer all inmates "who have been diagnosed with Hepatitis C for immediate evaluation and treatment because the VCU Telemedicine Clinic does not have the capacity to see that many inmates at once." (*Id.* ¶ 17.) For example, in 2015, "VCU only had the capacity to see 250 patients." (*Id.*) "VDOC has tried, unsuccessfully, to enter into arrangements with other specialty groups, so that VDOC could refer more inmates for treatment." (*Id.*) As a result of VDOC's inability "to enter into any additional arrangements, there is a practical limit to the number of inmates who can be referred at a single time." (*Id.*) "The number of inmates who are treated per year has always been determined based on the clinic capacity at VCU. No individual at VDOC has told the providers at VCU to limit the number of patients they can treat." (*Id.* ¶ 18.)

### B. Hinton's Receipt of Medical Treatment for Hepatitis C

"On April 15, 2015, Mr. Hinton had blood drawn so that he could be tested for several viral diseases, including Hepatitis C (or HCV)." (Reed Aff. ¶ 6.) On June 8, 2015, Dr. Calhoun, a physician at LVCC, received and reviewed the results. (*Id.*) On July 1, 2015, additional bloodwork was ordered, "which confirmed that Mr. Hinton had tested positive for HCV

antibodies." (*Id.* ¶ 7.) On July 9, 2015, Dr. Calhoun "ordered additional laboratory testing to determine the HCV quantitative load." (*Id.* ¶ 8.)

Dr. Calhoun reviewed Hinton's laboratory results on July 19, 2015. (*Id.* ¶ 9.) Dr. Calhoun "calculated an APRI score (Aspartate Aminotransferase to Platelet Ratio) of 0.248, and a FIB–4 score of 1.10. Dr. Calhoun documented that these scores did not meet the current criteria for referral to the hepatology specialists at VCU." (*Id.*) Subsequently, on October 2, 2015, Hinton "had blood drawn so that he could receive genotype testing for his HCV. Those lab results, which were generated on October 8, 2015, reflect that Mr. Hinton's HCV infection was attributable to genotype 'lb.'" (*Id.* ¶ 10.)

Hinton met with a nurse on October 22, 2015, to discuss his HCV diagnosis. (*Id.* ¶ 11.) "As of November 2015, HCV was added to the list of conditions that were being monitored for Mr. Hinton during his periodic chronic care visits at LVCC." (*Id.* ¶ 12.) Thereafter, Hinton had chronic care appointments, "which included a review of his HCV," on the following dates: "11/25/15, 6/21/16, 11/22/16, 6/7/17, 11/30/17, 6/5/18, 10/3/18, 2/6/19, and 6/10/19." (*Id.* ¶ 47.) Hinton had bloodwork "to assess the status of his HCV infection" on the following dates: "4/15/15, 7/1/15, 10/2/15, 3/3/16, 5/4/16, 9/30/16, 2/7/17, 11/8/17, 3/7/18, 8/3/18, 9/20/18, 11/15/18, 1/10/19, 1/23/19, and 1/29/19." (*Id.* ¶ 48.) Hinton "also had two liver ultrasounds and Fibroscan testing." (*Id.*)

On March 11, 2019, Hinton's "recent laboratory test results were faxed to VDOC's medical director . . . to see whether Mr. Hinton satisfied the criteria for referral to VCU's Telemedicine Clinic." (*Id.* ¶ 41.) Thereafter, "[o]n April 10, 2019, Dr. Amonette, the VDOC Chief Physician, notified LVCC that Mr. Hinton had been approved for referral to the VCU Medical Center Hepatitis C Telemedicine Clinic." (*Id.* ¶ 43.) "[U]ntil March 2019, none of the medical

providers at LVCC discussed Mr. Hinton's HCV diagnosis with Dr. Amonette or otherwise asked that Mr. Hinton be evaluated as a candidate for referral to the VCU Telemedicine Clinic." (*Id.* ¶ 50.) "Once Dr. Amonette approves an inmate for referral to VCU, the medical providers at the institution are responsible for transmitting the appropriate paperwork to VCU and coordinating the initial consultation." (*Id.* ¶ 51.) In his Affidavit, Hinton indicates that, as of July 27, 2019, "[he] still has not [had] any Hep[atitis] C virus medication at (VCU) or anything else." (Hinton Aff. 3.)

### III. DEFENDANTS' ARGUMENTS FOR DISMISSAL

Defendants argue that their Motion for Summary Judgment should be granted because: (1) Hinton's "claims for injunctive or equitable relief are moot, and Hinton cannot recover compensatory damages from the Defendants in their official capacities," (2) Defendants are entitled to qualified immunity, and (3) Hinton's claims fail on the merits. (Mem. Supp. Mot. Summ. J. 13–20, ECF No. 39 (emphasis omitted).)

#### A. Injunctive Relief and Compensatory Damages for Official Capacity Claims

Defendants first argue that Hinton's claims for injunctive relief are moot "because Dr. Amonette has approved Hinton for referral to the liver specialists at VCU, so that Hinton can be evaluated for appropriate HCV medications and treatment." (*Id.* at 13 (citation omitted).)

"[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the out-come." *Incumaa v. Ozmint*, 507 F.3d 281, 286 (4th Cir. 2007) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). "[F]ederal courts have 'no authority to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'" *Id.* (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992)).

Here, although the record reflects that Hinton was approved for Hepatitis C treatment in April 2019, (Reed Aff. ¶ 43), the record further reflects that, as of July 27, 2019, Hinton had not received "any Hep[atitis] C virus medication at (VCU) or anything else." (Hinton Aff. 3.) Neither Hinton nor Defendants have provided any additional information regarding Hinton's receipt of treatment for Hepatitis C. As such, at this time, the current briefing does not support Defendants' argument that Hinton's claims for injunctive relief are moot.

Additionally, Defendants argue that, because "officials acting in their official capacities are not 'persons' within the meaning of 42 U.S.C. § 1983," "to the extent that Hinton is requesting an award of monetary damages from Defendants in their official capacities, they are immune." (Mem. Supp. Mot. Summ. J. 14 (citations omitted).) "The [Supreme] Court has held that, absent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court." *Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (citation omitted). "This bar remains in effect when State officials are sued for damages in their official capacity." *Id.* (citations omitted); *see Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). As relevant here, the Commonwealth of Virginia has not consented to suits under § 1983, and Congress has not abrogated the Commonwealth of Virginia's Eleventh Amendment immunity for § 1983 cases. *See Madden v. Virginia*, No. 3:11CV241–HEH, 2011 WL 2559913, at *3 (E.D. Va. June 27, 2011). Accordingly, to the extent that Hinton seeks an award of monetary damages from Defendants in their official capacity, Defendants' Motion for Summary Judgment will be GRANTED.

### B. Qualified Immunity

Defendants also argue that they are entitled to qualified immunity. (Mem. Supp. Mot. Summ. J. 14–17.) In asserting entitlement to qualified immunity, Defendants' argument is largely

centered on a case from the United States District Court for the Western District of Virginia, *Riggleman v. Clarke*, No. 5:17–cv–00063, 2019 WL 1867451 (W.D. Va. Apr. 25, 2019). Defendants, however, do not adequately address Hinton's specific claims in the present case.

When a defendant asserts that he or she is entitled to qualified immunity, he or she "must do more than mention its existence and demand dismissal of the suit." *Fisher v. Neale*, No. 3:10CV486–HEH, 2010 WL 3603495, at *3 (E.D. Va. Sept. 8, 2010). Specifically, a defendant must:

> (1) identify the specific right allegedly violated "at the proper level of particularity," *Campbell v. Galloway*, 483 F.3d 258, 271 (4th Cir. 2007); (2) brief, with full supporting authority, why the right was not so clearly established as to put a reasonable official on notice of any legal obligations; and (3) describe with particularity the factual basis supporting the assertion that a reasonable official in the defendant's situation would have believed his conduct was lawful. *See Collinson v. Gott*, 895 F.2d 994, 998 (4th Cir. 1990).

*Id.* Based on these requirements, Defendants' briefing on qualified immunity is inadequate and does not provide a basis for granting summary judgment at this time.

### C. Merits of Hinton's Eighth Amendment Claims

To survive a motion for summary judgment on an Eighth Amendment claim, a plaintiff must demonstrate: "(1) that objectively the deprivation of a basic human need was 'sufficiently serious,' and (2) that subjectively the prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). With respect to claims of inadequate medical treatment under the Eighth Amendment, "the objective component is satisfied by a serious medical condition." *Quinones*, 145 F.3d at 167. A medical need is "serious" if it "has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v.*

*Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)); *see Webb v. Hamidullah*, 281 F. App'x 159, 165 (4th Cir. 2008) (citing *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)).

The subjective prong of an Eighth Amendment claim requires the plaintiff to demonstrate that a particular defendant actually knew of and disregarded a substantial risk of serious harm to his person. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Quinones*, 145 F.3d at 168 (citing *Farmer*, 511 U.S. at 837); *see Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997). Thus, to survive a motion for summary judgment under the deliberate indifference standard, a plaintiff "must show that the official in question subjectively recognized a substantial risk of harm. . . . [and] that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)).

In evaluating a prisoner's complaint regarding medical care, the Court is mindful that "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at 103–04). In this regard, the right to medical treatment is limited to that treatment

which is medically necessary and not to "that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977).

Here, Defendants argue that "Director Clarke has no involvement in the promulgation or application of the VDOC Hepatitis C guidelines, nor did he have any actual and subjective knowledge of this particular plaintiff's medical situation." (Mem. Supp. Mot. Summ. J. 18.) Defendants also argue that, "[w]ith respect to Dr. Amonette, neither his adoption of the hepatitis C guidelines nor his application of them to Hinton's situation constitute deliberate indifference." (*Id.*) Specifically, Defendants argue that, "[a]s relevant to this particular case, Dr. Amonette was not asked to consider whether Hinton should be referred for HCV medication until April 2019," and after receiving this request in April 2019, "Dr. Amonette determined that Hinton did, in fact, qualify for referral to a liver specialist at VCU." (*Id.*)

As the United States Court of Appeals for the Fourth Circuit has explained, however, officials, such as Defendants Clarke and "Amonette[,] may not escape liability by claiming that [they] did not know the identities of the inmates who would suffer under [their] policies." *Gordon v. Schilling*, 937 F.3d 348, 362 (4th Cir. 2019) (citing *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015)). Further, "official[s] can be personally liable for creating or applying unconstitutional policy." *Id.* (quoting *Jackson v. Nixon*, 747 F.3d 537, 543 (8th Cir. 2014)). Besides Defendants' arguments regarding their lack of personal involvement in the specific decisions regarding Hinton's medical treatment, Defendants fail to address their liability for the promulgation and enforcement of the VDOC's policies regarding treatment for Hepatitis C. Accordingly, based on the current briefing, the Court declines to dismiss Hinton's Eighth Amendment claims on the merits.

## IV. HINTON'S NON-DISPOSITIVE MOTION

Hinton filed a document entitled "Affidavit" and "Motion to Submit Sworn Affidavit." (ECF No. 37.) In this filing, Hinton submits an "Affidavit" responding to the Court's dismissal of Defendants Calhoun, Corion Health Care Group, the Geo Group, Inc., and McCabe without prejudice due to his failure to serve these Defendants. (ECF Nos. 33, 34.) Because Hinton submitted his "Affidavit" with his Motion, the Motion to Submit Sworn Affidavit will be DENIED as unnecessary.

## V. CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment (ECF No. 38) will be GRANTED IN PART and DENIED IN PART WITHOUT PREJUDICE.[5] Hinton's claim for an award of monetary damages from Defendants in their official capacity will be DISMISSED. Hinton's Motion to Submit Sworn Affidavit (ECF No. 37) will be DENIED as unnecessary. Defendants shall have forty-five (45) days to resubmit their Motion for Summary Judgment addressing Hinton's remaining claims. The Memorandum in Support of the Motion for Summary Judgment must adequately brief each claim and any such affirmative defenses Defendants intend to raise.

An appropriate Final Order shall accompany this Memorandum Opinion.

Date: 12 March 2020
Richmond, Virginia

/s/ _____
John A. Gibney, Jr.
United States District Judge

---

[5] In reaching this conclusion, the Court also considers the general rule that a party shall not file separate motions for summary judgment. *See* E.D. Va. Loc. Civ. R. 56(C) ("Unless permitted by leave of Court, a party shall not file separate motions for summary judgment addressing separate grounds for summary judgment.").

15