IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

**DONALD LEE HINTON,**

    Plaintiff,

v.                                                                                          Civil Action No. **3:18CV59**

**MARK AMONETTE,** *et al.,*

    Defendants.

**MEMORANDUM OPINION**

Donald Lee Hinton, Virginia inmate proceeding *pro se* and *in forma pauperis*, filed this civil action under 42 U.S.C. § 1983. The action proceeds on Hinton's Second Particularized Complaint ("Complaint," ECF No. 19).[1] In his Complaint, Hinton contends that Defendant Harold W. Clarke, Director of the Virginia Department of Corrections ("VDOC"), violated his rights under the Eighth Amendment[2] by promulgating a policy that denies inmates, such as Hinton, medication for Hepatitis C "solely because of cost" and which "'states you must be real sick with this deadly virus' before medication can be given." (*Id.* at 3.) Hinton contends that Defendant Mark Amonette, Chief Medical Director of the VDOC, violated his Eighth Amendment rights by enforcing this policy. (*Id.* at 4.) Hinton demands monetary damages and injunctive relief in the form of the medication to treat his Hepatitis. (*Id.* at 7.) The matter is before the Court on

---

[1] The Court employs the pagination assigned by the CM/ECF docketing system to Hinton's submissions. The Court corrects the spelling and capitalization in the quotations from the parties' submissions.

[2] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

Defendants' Renewed Motion for Summary Judgment. For the reasons set forth below, the Renewed Motion for Summary Judgment (ECF No. 51) will be GRANTED.

Between 2015 and the present, the treatment for Hepatitis C has significantly evolved. The record reveals that the Virginia Department of Corrections ("VDOC") and Dr. Amonette kept apace of those developments. Nevertheless, because only a few medical professionals had the expertise to administer and monitor treatment with the new Direct Acting Antivirals, treatment was prioritized to those individuals most in need of treatment. Despite these limitations, over the course of this litigation Hinton has been treated and cured of his Hepatitis C infection.

## I. STANDARD FOR SUMMARY JUDGMENT

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility of informing the Court of the basis for the motion and identifying the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c), (e) (1986)).

In reviewing a summary judgment motion, the Court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835

(4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). A mere "*scintilla* of evidence," however, will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448). Additionally, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)); *see* Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials . . . .").

In support of their Renewed Motion for Summary Judgment, Defendants submit: the affidavit of Wanda Reed, R.N. ("Reed Aff.," ECF No. 52-1); the affidavit of Mark Amonette, M.D. ("Amonette Aff.," ECF No. 52-2); a supplemental affidavit of Mark Amonette ("Amonette II Aff.," ECF No. 52-3); excerpts from a deposition of Frederick J. Schilling in *Riggleman v. Clarke* ("Schilling Dep.," ECF No. 52-4); excerpts from a deposition of Mark Amonette in *Riggleman v. Clarke* ("Amonette Dep.," ECF No. 52-5); excerpts from a deposition of H. Clarke in *Riggleman v. Clarke* ("Clarke Dep.," ECF No. 52-6); excerpts from a deposition of R. Sterling in *Riggleman v. Clarke* ("Sterling Dep.," ECF No. 52-7); an affidavit from H. Clarke in *Pfaller v. Clarke* ("Clarke I Aff.," ECF No. 52-8); an affidavit of M. Amonette in *Pfaller v. Clarke* ("Amonette III Aff.," ECF No. 52-9); the Federal Bureau of Prisons Guidelines for Management of Hepatitis C infection (ECF No. 52-10); excerpts from a deposition of Dr. Zawitz in *Pfaller v. Clarke* ("Zawitz Dep.," ECF No. 52-11); excerpts from a deposition of Dr. Amonette in *Pfaller v. Clarke* ("Amonette II Dep.," ECF No. 52-12); excerpts from the expert report of Dr. Alsina in *Pfaller v.*

3

*Clarke* ("Alsina Report," ECF No. 52-13); excerpts from the expert report of Dr. Zawitz in *Pfaller v. Clarke* ("Zawitz Report," ECF No. 52-14); excerpts from the deposition of the VDOC in *Pfaller v. Clarke* ("VDOC Dep.," ECF No. 52-15); excerpt from the deposition of Dr. Sterling from Virginia Commonwealth University ("VCU") in *Pfaller v. Clarke* ("VCU Deposition," ECF No. 52-16); and the American Association for the Study of Liver Disease ("AASLD") guidelines for treating individuals with Hepatitis C from 2015 and 2019 ("2015 AASLD guidelines," ECF No. 52-17; "2019 AASLD guidelines, ECF No. 52-18).

At this stage, the Court is tasked with assessing whether Hinton "has proffered sufficient proof, in the form of *admissible* evidence, that could carry the burden of proof of his claim at trial." *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1316 (4th Cir. 1993) (emphasis added). The facts offered by affidavit must be in the form of admissible evidence. *See* Fed. R. Civ. P. 56(c). In this regard, any statement in an affidavit or sworn statement "must be made on personal knowledge . . . and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Summary judgment affidavits must also "set out facts that would be admissible in evidence." *Id.* Thus, "summary judgment affidavits cannot be conclusory or based upon hearsay." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (citing *Md. Highways Contractors Ass'n v. Maryland*, 933 F.2d 1246, 1252 (4th Cir. 1991); *Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 975 (4th Cir. 1990)).

Hinton swore under penalty of perjury to the truth of his statements in his Complaint. Large portions of Hinton's Complaint, however, are conclusory legal assertions, which fail to constitute admissible evidence. Hinton also submitted an affidavit, wherein he swears that as a result of his Hepatitis "B–C virus" he experienced "stomach swelling, . . . pancreas area swelling in constant pain, . . . abdominal swelling, . . . liver . . . pain, . . . [and] kidney area bloating and painful." (ECF

4

No. 57.)³ However, Hinton, as a lay person is not competent to testify that his Hepatitis C, rather than his many other ailments, caused these physical problems. *Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001); *cf. Raynor v. Pugh*, 817 F.3d 123, 131 (4th Cir. 2016) (Keenan J., concurring) (explaining that a layperson's interpretation of medical tests or "speculation regarding the causes" of a condition "constitute conclusory and inadmissible lay opinion").⁴

In light of the foregoing submissions and principles, the following facts are established for purposes of the Motion for Summary Judgment. The Court draws all permissible inferences in favor of Hinton.

## II.  UNDISPUTED FACTS

At all times relevant to this suit, Hinton was incarcerated at Lawrenceville Correctional Center ("LVCC"). (Reed Aff. ¶ 5.)

### A.  VDOC Policies Regarding Hepatitis C

"Hepatitis C is a viral infection that can lead to liver inflammation and scarring." (Amonette Aff. ¶ 5.) Some individuals infected with Hepatitis C are asymptomatic, and "in those individuals, the disease can persist for many years without causing any harm." (*Id.*) For other individuals, however, "the infection will cause liver disease to progress and result in illness." (*Id.*)

Initially, "VDOC issued Hepatitis C treatment guidelines in February 2004." (*Id.* ¶ 6.) The 2004 Guidelines were written before Dr. Amonette "assumed [his] current role within VDOC,"

---

³ Much of Hinton's affidavit presents facts not relevant to the remaining claims before the Court.

⁴ Even if the Court were to consider that Hepatitis C was the cause of the physical problems Hinton describes, it would not alter the conclusion that neither Dr. Amonette nor Director Clarke acted with deliberate indifference to Hinton's Hepatitis C infection.

and Dr. Amonette "was not involved in the preparation or implementation of those guidelines." (*Id.*)

### 1. The Arrival of Direct-acting antiviral drugs

In 2015, Direct-acting antiviral drugs (DAAs) became available to treat Hepatitis C. (VCU Deposition 17.) The DAAs had a much higher cure rate for Hepatitis C than previous medications. (Amonette III Aff. ¶ 7.) In February 2015, in light of the advancements "in the medications used to treat Hepatitis C infections and generally evolving standards of care, VDOC issued updated Hepatitis C Guidelines." (Amonette Aff. ¶ 7.) The VDOC Guidelines "were revised in collaboration with Richard Sterling, M.D., a hepatologist at [VCU]," who is "a nationally-recognized expert in Hepatitis C." (*Id.*) This revision resulted in the June 2015 Guidelines. (*Id.*)[5]

### 2. 2015 Guidelines

The purpose of the 2015 Guidelines was to ensure that the individuals in the greatest need of Hepatitis C treatment would be prioritized to receive the resources available to treat such individuals. (Amonette II Dep. 29.) VDOC implemented a referral process, in which inmates are referred "to the VCU Hepatitis C Telemedicine Clinic for assessment and treatment by liver specialists[,] because managing the treatment of Hepatitis C and the medications associated with that treatment (typically direct-acting antivirals, or "DAAs") requires specialized training." (Amonette Aff. ¶ 15.) In Dr. Amonette's "professional opinion, it is not clinically appropriate to have VDOC medical providers 'in the field' prescribe direct-acting antivirals without specialty input." (*Id.*) Dr. Amonette indicates that "it is common for primary care physicians to refer patients infected with Hepatitis C to hepatologists for treatment because non-specialist physicians

---

[5] The Court omits the secondary citations set forth in Defendants' affidavits.

are not completely knowledgeable about the applicable standards of care relating to management of those patients." (*Id.* ¶ 16.)

In 2019, approximately 2750 inmates in the VDOC had Hepatitis C. (Amonette Aff. ¶ 20.)[6] "The VDOC cannot refer all inmates who have been diagnosed with Hepatitis C for immediate evaluation and treatment because the VCU Telemedicine Clinic does not have the capacity to see that many inmates at once." (*Id.* ¶ 17.) In 2015, "VCU only had the capacity to see 250 patients during that first year of the agreement. VDOC has tried, unsuccessfully, to enter into arrangements with other specialty groups, so that VDOC could refer more inmates for treatment." (*Id.*) "The number of inmates who are treated per year [was] determined based on the clinic capacity at VCU." (*Id.* ¶ 18.)

"Under the updated 2015 Guidelines, VDOC entered into a Memorandum of Understanding [("MOU")] with the hepatology group at VCU Medical Center." (*Id.* ¶ 9.) The 2015 Guidelines provide that,

> based on the results of certain liver enzyme testing, inmates who show the worst disease progression, including possible impairment of their liver functioning, will be referred for assessment by the liver specialists at VCU. Inmates whose laboratory test results show early or mild disease will be monitored through periodic chronic care assessments, and they will also receive routine laboratory testing to monitor their liver enzyme levels and watch for signs that their disease is beginning to progress. The numerical values that determine when an inmate should be considered for referral or additional testing were determined by the liver specialists at VCU.

(*Id.*) Specifically, pursuant to the 2015 Guidelines, inmates receive an "Aspartate Aminotransferase to Platelet ratio" ("APRI") score and a "Fibrosis–4 index" ("FIB-4") score. (*Id.* ¶ 10.) The criteria for treatment is as follows:

---

[6] In 2020, approximately 2500 inmates in the VDOC had Hepatitis C. (Amonette III Aff. ¶ 23.)

7

- <u>APRI score less than 0.5 and FIB-4 score less than 1.45</u>: Offender is monitored but not referred to VCU for evaluation. Inmates in this category will receive periodic laboratory blood testing and chronic care appointments with a medical provider at the institution.
- <u>APRI score of 0.5 to 1.5 and FIB-4 score is between 1.45 and 3.25</u>: Indeterminate range; requires additional testing to determine whether the offender should be referred for evaluation.
- <u>APRI score greater than 1.5 and FIB-4 score greater than 3.25</u>: Offender is automatically referred to VCU for evaluation without any additional testing.

(*Id.*)

With respect to the referral process, "if an institutional physician believed that an inmate should be considered for referral to the Hepatitis C clinic, the physician would forward their medical information, including the results of the recent laboratory testing, to [Dr. Amnonette]." (*Id.* ¶ 11.) Using the above-listed criteria, "Dr. Amonette would determine whether the numerical values in their laboratory results . . . indicated that [the inmate] should be referred for evaluation." (*Id.*) Upon approval for a referral, "the inmate would be seen through the Hepatitis C Telemedicine Clinic. If no medical reason was found to not treat the inmate, the inmate would be prescribed treatment and a prescription would be sent to the VCU pharmacy. That pharmacy would provide the medication for the offender's treatment." (*Id.*) After providers at VCU "determine what treatment is appropriate for a particular inmate, VDOC does not question or otherwise attempt to alter that treatment plan. The decision as to which medication is prescribed is made by the VCU provider at the VCU clinic." (*Id.* ¶ 12.)

The MOU between the VDOC and VCU was modified in September 2018, "and the telemedicine clinic has been expanded to allow more inmates to be referred for evaluation and treatment. Following the expansion of the clinic capacity at VCU, that institution has estimated that they will be able to treat approximately 624 offenders per year." (*Id.* ¶ 19.)

### 3. 2019 Guidelines

In April 2019, the current VDOC Guidelines were issued. (*Id.* ¶ 22.) "Under these guidelines, VDOC continues to prioritize treatment based on disease severity, dividing inmates into three priority levels." (*Id.*) Inmates in priority levels 1 and 2, "which include inmates who are determined to have liver scarring or fibrosis, as well as those inmates with medical conditions that could exacerbate liver disease (such as HIV)" receive treatment for Hepatitis C. (*Id.*) "Priority level 3 inmates receive ongoing chronic care monitoring and routine testing to watch for signs of disease progression." (*Id.*) From 2015 until the present time, approximately 1144 inmates with Hepatitis C have been treated with DAAs. (Amonette III Aff. ¶ 24.)

With respect to the medical treatment provided to individuals with Hepatitis C, "[t]he American Association for the Study of Liver Disease (AASLD) recommends that, at some point, everyone with Hepatitis C should receive treatment. The AASLD, however, also acknowledges that, in certain circumstances, it is appropriate to prioritize care." (Amonette ¶ 23.) In determining medical treatment for inmates, "VDOC does not have a line-item budget for Hepatitis C medications, and VDOC does not stop referring or treating inmates because a certain figure has been reached." (*Id.* ¶ 13.) Further, "[c]ost is not a factor in determining how many inmates will be treated for Hepatitis C in a fiscal year. VDOC does not make decisions not to treat offenders based on finances." (*Id.* ¶ 14.)

### B. Hinton's Receipt of Medical Treatment for Hepatitis C

"On April 15, 2015, Mr. Hinton had blood drawn so that he could be tested for several viral diseases, including Hepatitis C (or HCV)." (Reed Aff. ¶ 6.) On June 8, 2015, Dr. Calhoun, a physician at LVCC, received and reviewed the results. (*Id.*) On July 1, 2015, additional bloodwork was ordered, "which confirmed that Mr. Hinton had tested positive for HCV

antibodies." (*Id.* ¶ 7.) On July 9, 2015, Dr. Calhoun "ordered additional laboratory testing to determine the HCV quantitative load." (*Id.* ¶ 8.)

Dr. Calhoun reviewed Hinton's laboratory results on July 19, 2015. (*Id.* ¶ 9.) Dr. Calhoun "calculated an APRI score (Aspartate Aminotransferase to Platelet Ratio) of 0.248, and a FIB-4 score of 1.10. Dr. Calhoun documented that these scores did not meet the current criteria for referral to the hepatology specialists at VCU." (*Id.*) Subsequently, on October 2, 2015, Hinton "had blood drawn so that he could receive genotype testing for his HCV. Those lab results, which were generated on October 8, 2015, reflect that Mr. Hinton's HCV infection was attributable to genotype '1b.'" (*Id.* ¶ 10.)

Hinton met with a nurse on October 22, 2015, to discuss his HCV diagnosis. (*Id.* ¶ 11.) "As of November 2015, HCV was added to the list of conditions that were being monitored for Mr. Hinton during his periodic chronic care visits at LVCC." (*Id.* ¶ 12.) Thereafter, Hinton had chronic care appointments, "which included a review of his HCV," on the following dates: "11/25/15, 6/21/16, 11/22/16, 6/7/17, 11/30/17, 6/5/18, 10/3/18, 2/6/19, and 6/10/19." (*Id.* ¶ 47.) Hinton had bloodwork "to assess the status of his HCV infection" on the following dates: "4/15/15, 7/1/15, 10/2/15, 3/3/16, 5/4/16, 9/30/16, 2/7/17, 11/8/17, 3/7/18, 8/3/18, 9/20/18, 11/15/18, 1/10/19, 1/23/19, and 1/29/19." (*Id.* ¶ 48.) Hinton "also had two liver ultrasounds and Fibroscan testing." (*Id.*)

Until 2019, Hinton's lab work did not indicate that Hinton was developing liver inflammation or cirrhosis. (*Id.* ¶ 48.) However, in the beginning of 2019, Hinton had a lab test that indicated his condition was deteriorating. (*Id.* ¶ 49.) On March 11, 2019, Hinton's "recent laboratory test results were faxed to VDOC's medical director . . . to see whether Mr. Hinton satisfied the criteria for referral to VCU's Telemedicine Clinic." (*Id.* ¶ 41.) Thereafter, "[o]n April

10, 2019, Dr. Amonette, the VDOC Chief Physician, notified LVCC that Mr. Hinton had been approved for referral to the VCU Medical Center Hepatitis C Telemedicine Clinic." (*Id.* ¶ 43.)

Subsequently, medical specialists at the Telemedicine Clinic approved Mr. Hinton for treatment for Hepatitis C in the form of DAAs. (Amonette II Aff. ¶ 4.) On October 18, 2019, Mr. Hinton began receiving DAAV treatments. (*Id.*) Mr. Hinton completed his DAAs treatments on December 3, 2019. (*Id.*) Following completion of his treatment, laboratory tests confirmed that Mr. Hinton had been cured of his Hepatitis C viral infection. (*Id.* ¶ 5.)

"[U]ntil March 2019, none of the medical providers at LVCC discussed Mr. Hinton's HCV diagnosis with Dr. Amonette or otherwise asked that Mr. Hinton be evaluated as a candidate for referral to the VCU Telemedicine Clinic." (*Id.* ¶ 50.) "Once Dr. Amonette approves an inmate for referral to VCU, the medical providers at the institution are responsible for transmitting the appropriate paperwork to VCU and coordinating the initial consultation." (*Id.* ¶ 51.)

### C. Director Clarke

Director Clarke does not approve "VDOC medical policies that govern the treatment of diseases or illness[es] of VDOC inmates." (Clarke Aff. ¶ 5.) In this regard, he did not review "Dr. Amonette's HCV treatment guidelines or in any way set limitations for Dr. Amonette as he drafted, revised, and implemented the HCV guidelines." (*Id.* ¶ 7.) Nor did he give any input "regarding whether the HCV guidelines were medically or financially appropriate." (*Id.* ¶ 8.) Director Clarke relies upon the medical judgment of Dr. Amonette and other trained medical professionals to determine the appropriate care for VDOC inmates. (*Id.* ¶ 11.)

## III. ANALYSIS

### A. Injunctive Relief

"[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the out-come." *Incumaa v. Ozmint*, 507 F.3d 281, 286 (4th Cir. 2007) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). Here, Hinton sought proper treatment for his Hepatitis C infection and a declaration that the VDOC policies that delayed his access to DAAs as unconstitutional. Hinton has received such treatment, been cured of his Hepatitis C infection, and would not benefit from any declaration regarding VDOC policies that no longer govern his medical care. Accordingly, Hinton's claims for injunctive relief will be DISMISSED AS MOOT.

### B. Merits of Hinton's Eighth Amendment Claims

To survive a motion for summary judgment on an Eighth Amendment claim, a plaintiff must demonstrate: "(1) that objectively the deprivation of a basic human need was 'sufficiently serious,' and (2) that subjectively the prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). With respect to claims of inadequate medical treatment under the Eighth Amendment, "the objective component is satisfied by a serious medical condition." *Id.* A medical need is "serious" if it "has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008) (quoting *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999)); *accord Webb v. Hamidullah*, 281 F. App'x 159, 165 (4th Cir. 2008) (citing *Ramos v. Lamm*, 639 F.2d 559, 575 (10th Cir. 1980)).

The subjective prong of an Eighth Amendment claim requires the plaintiff to demonstrate that a particular defendant actually knew of and disregarded a substantial risk of serious harm to his person. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those general facts and the specific risk of harm confronting the inmate." *Quinones*, 145 F.3d at 168 (citing *Farmer*, 511 U.S. at 837); *accord Rich v. Bruce*, 129 F.3d 336, 338 (4th Cir. 1997). Thus, to survive a motion for summary judgment under the deliberate indifference standard, a plaintiff "must show that the official in question subjectively recognized a substantial risk of harm. . . . [and] that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)).

In evaluating a prisoner's complaint regarding medical care, the Court is mindful that "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at 103–04). In this regard, the right to medical treatment is limited to that treatment which is medically necessary and not to "that which may be considered merely desirable." *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977).

It is first appropriate to put to rest Hinton's contention that cost was a determinative factor in the policies which denied him receiving Hepatitis C treatment sooner. Instead, the record reflects that the delay in Hinton receiving Hepatitis C treatment flowed from the limited clinic capacity at VCU for treating individuals with DAAs. Faced with a finite number of slots for treatment, Dr. Amonette prioritized for treatment those inmates who were determined to have liver scarring or fibrosis, as well as those inmates with medical conditions that could exacerbate liver disease (such as HIV). Meanwhile, inmates such as Hinton received ongoing chronic care monitoring and routine testing to watch for signs of disease progression. The evidence before the Court fails to suggest that by promulgating and implementing such a plan Dr. Amonette acted with deliberate indifference. *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263 (11th Cir. 2020).[7]

Furthermore, Hinton fails to demonstrate that Dr. Amonette acted with deliberate indifference to his Hepatitis C virus. As noted above, at this stage, Hinton "must show that [Dr. Amonette] subjectively recognized a substantial risk of harm. . . . [and] that [Dr. Amonette] subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee*, 372 F.3d at 303 (quoting *Rich*, 129 F.3d at 340 n.2). The record reflects that Hinton's condition was regularly monitored between 2015 and 2019. Not until March of 2019 "did any of Mr. Hinton's lab work or physical examinations indicate that he was developing liver inflammation or liver cirrhosis." (Reed Aff. ¶ 49.) On March 11, 2019, Hinton's recent laboratory

---

[7] In *Hoffer*, the United States Court of Appeals for the Eleventh Circuit reviewed the constitutionality of the Florida Department of Corrections treatment plan for Hepatitis C positive inmates. *Hoffer*, 973 F.3d at 1267–69. In that case, prison officials monitored all HCV-positive inmates, including those who had yet to exhibit serious symptoms, and provided expensive DAA treatment to anyone who had an exacerbating condition, showed signs of rapid progression, or developed even moderate fibrosis, though DAA treatment was not provided to inmates who had mild or no liver fibrosis. *Id.* The Eleventh Circuit concluded that such a plan did not reflect deliberate indifference. *Id.* at 1278.

tests were faxed to Dr. Amonette to determine whether "Hinton satisfied the criteria for referral to VCU's Telemedicine Clinic." (*Id.* ¶ 41.) This was the first time Dr. Amonette had been asked to determine whether Hinton was an appropriate candidate for referral treatment under the VDOC treatment guidelines. (Amonette Aff. ¶ 25.) On April 10, 2019, Dr. Amonette notified the medical staff at Hinton's place of incarceration that "Hinton had been approved for referral to the VCU Medical Center Hepatitis C Telemedicine Clinic." (Reed Aff. ¶ 43.)

Once Dr. Amonette approves an inmate for referral, "the medical providers at the inmate's institution are responsible for transmitting the appropriate paperwork to VCU and coordinating the initial consultation." (*Id.* ¶ 51.)[8] Although there was some delay, the medical providers at Hinton's place of incarceration eventually coordinated this care, and Hinton began receiving DAAs in October of 2019 and was cured of his Hepatitis C infection.

The course of treatment provided by Dr. Amonette for Hinton's Hepatitis C infection fails to support an inference of deliberate indifference on the part of Dr. Amonette. *See Parrish ex rel. Lee*, 372 F.3d at 303 (quoting *Rich*, 129 F.3d at 340 n.2). Accordingly, Hinton's Eighth Amendment claim against Dr. Amonette will be DISMISSED.

Furthermore, Hinton fails to demonstrate that Director Clarke acted with deliberate indifference. "If a prisoner is under the care of medical experts . . . , a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands." *Iko*, 535 F.3d at 242 (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)). Hinton fails to direct the Court to any evidence that this general rule should not hold true here. There is no evidence that Director

---

[8] Defendant Amonette directed the medical staff at Hinton's place of incarceration to prepare Hinton's preregistration form and ensure that all the appropriate lab work was completed and was sent to the VCU Medical Center Hepatitis C Telemedicine Clinic. (ECF No. 39-2, at 44.)

Clarke interfered with or in any way limited the medical care for Hinton's Hepatis C infection. Accordingly, Hinton's Eighth Amendment claim against Director Clarke will be DISMISSED.

## IV. CONCLUSION

For the foregoing reasons, Defendants' Renewed Motion for Summary Judgment (ECF No. 51) will be GRANTED. Hinton's claims will be DISMISSED. The action will be DISMISSED.

An appropriate Final Order shall accompany this Memorandum Opinion.

Date: 27 January 2021
Richmond, Virginia

/s/ John A. Gibney, Jr.
United States District Judge